IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| STEVEN PAUL PRIEST, | ) | |
| | ) | |
| Petitioner, | ) | Case No. CV01-0173-C-MHW |
| | ) | |
| vs. | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER** |
| JOHANNA SMITH, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Pending before the Court are several motions ripe for adjudication in this habeas corpus action.  The parties have consented to the jurisdiction of a United State Magistrate Judge to enter final orders in this case.  (Docket Nos. 9 & 22.)  Having reviewed the motions, the Court has determined that oral argument is unnecessary.  Accordingly, having considered the written arguments of the parties, and having reviewed the state court record, the Court enters the following Order.

## BACKGROUND

Following a jury trial in 1991, Petitioner Steven Paul Priest was convicted of first degree murder of a fellow drug associate by shooting him in the head.   On May 26, 1994, he was sentenced to a fixed life term without the possibility of parole by the district court, Fourth Judicial District, for Boise County, Idaho.  After his conviction, Petitioner filed a direct appeal challenging the conviction and sentence.  He asserts that in his direct appeal,

MEMORANDUM DECISION AND ORDER  1

he raised mental health issues similar to those asserted in his current federal Habeas Corpus Petition.  For example, in the portion of the opinion affirming the sentence, the Idaho Court of Appeals wrote, "Although the district court recognized that Priest suffered from an organic brain disorder that resulted in impairment of his impulse control and interfered with his ability to make proper moral decisions, the court nonetheless concluded that in light of the circumstances of the murder, 'It is clear that the defendant should never again live in free society, and he will not.'"  *State v. Priest*, 128 Idaho 6, 18, 909 P.2d 624, 636 (Idaho Ct. App. 1995).

Petitioner filed a variety of state post-conviction and habeas corpus actions after his direct appeal; none was successful.  This federal habeas corpus action was initially filed on April 19, 2001, and was stayed on July 1, 2002, while Petitioner pursued further state court relief.  On May 21, 2008, Petitioner filed an Amended Petition and a Second Amended Petition.  (Docket Nos. 105 & 108.)  The case was re-opened, and Respondent filed the Motion for Summary Dismissal (Docket No. 156) that is now at issue.

## PRELIMINARY MOTIONS

Petitioner has filed a Motion to Proceed in Forma Pauperis.  (Docket No. 150.) His request was previously denied because he had paid the filing fee and because he held a prison job.  However, his recent Affidavit shows that he no longer has a prison job, and he makes the request for in forma pauperis status to allow him to receive any necessary copies of documents and proceed on appeal without charge.  Good cause appearing, his Motion shall be granted.

MEMORANDUM DECISION AND ORDER  2

Petitioner has filed a Motion for Reconsideration of the Order of October 21, 2008, which is a five-page motion supported by fifty pages of exhibits; most of the exhibits are handwritten declarations of Petitioner.  Petitioner asks for clarification of the limitation placed on him that he is permitted to file and have pending no more than two five-page motions (with unlimited exhibits) at a time.  This limitation was imposed because Petitioner was filing a large number of irrelevant documents.  It is clear that Petitioner has no intention of following either the letter or the spirit of the Order, given that Petitioner has continued to file numerous motions and unlimited "declaration" pages, on which he continues his motion.  The Court clarifies that Petitioner's filing restriction while he is litigating in the federal district court remains in place.  Petitioner should make every effort to follow the Court's previous Order.

Petitioner also asks the Court to clarify whether he is permitted to amend his Petition to substitute his custodian as the respondent in this case.  Good cause appearing, the Court has substituted Warden Johanna Smith as the respondent.

Respondent filed a Motion for Extension of Time in which to file a dispositive motion in this case. (Docket No. 154.)  Good cause appearing, the motion shall be granted.  Respondent's Motion to Dismiss (Docket No. 156) shall be deemed timely filed.

Petitioner has filed a Motion to Extend Time to file a statement of factual issues in response to the dispositive motion.  (Docket No. 161.)  Because Petitioner is proceeding pro se, the Court will allow him additional time to file his response.  Petitioner's

MEMORANDUM DECISION AND ORDER  3

Statement of Disputed Material Factual Issues filed in response to the Motion to Dismiss (Docket No. 162) shall be deemed timely filed.

Petitioner has filed a "Motion for Permission to File with the Court Based on Extra-Ordinary Circumstances."  (Docket No. 160.)  Petitioner seeks permission to have more than three motions pending, contrary to the Court's prior case management order. The Court will permit the filings, but Petitioner is not entitled to relief based on the content of the filings.

Petitioner alleges that he should be permitted to file motions and papers in excess of what the Court has permitted him to file. He alleges that Respondent is attempting to defraud him in the State's fifth lodging of state court records.  Petitioner argues that it is not possible that his petition (State's Lodging M-1) could have been dismissed by a state court order (State's Lodging M-3) based on a voluntary motion to dismiss (State's Lodging M-2) because the State already filed a Rule 56 motion in that action on February 24, 1995.  However, the state court record indicates that the reason for the dismissal was that "Priest has filed a motion to dismiss his application for post-conviction relief "without prejudice."  (State's Lodging M-3.)  This Court rejects Petitioner's contention that Respondent committed fraud in its lodging.  A voluntary dismissal can be properly entered even though the State had answered and filed a motion for summary disposition.

MEMORANDUM DECISION AND ORDER  4

The order of dismissal (5/30/95) mooted any pending motion for summary disposition (2/27/95) previously filed by the State.[1]

Petitioner has also filed a Motion to Augment the Record.  (Docket No. 164.)  He wishes to add the State's motion for summary dismissal, an excerpt from the State's answer to petition for post-conviction relief, and the State's motion to take judicial notice–all of which were filed in the post-conviction action mentioned in the foregoing paragraph.  Respondent has no objection to augmenting the record with these filings.  Good cause appearing, the Motion to Augment shall be granted.

In addition, the Court shall augment the record with the state court register of actions for Petitioner's criminal case and associated cases, which are as follows: CV-2009-22, CV-2003-299, CV-2001-240, CV-1995-294 (which correlates to Respondent's Lodgings M-1 to M-4), and CR-1990-22.  This register of actions has been lodged in this habeas corpus action at Docket No. 170.

## RESPONDENTS' MOTION TO DISMISS

### A.    Standard of Law: Statute of Limitations and Tolling Provisions

Respondent moves the Court to dismiss Petitioner's entire Petition.  (Docket No. 156.)  Rule 4 of the Rules Governing § 2254 Cases authorizes the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the

---

[1]  See Register of Actions for Case No. CV1995-0000294 at http://www.idcourts.us/ repository (also lodged in this action at Docket No. 170).

MEMORANDUM DECISION AND ORDER  5

district court."   In such case, the Court construes the facts in a light most favorable to the petitioner.  When a court is considering a motion to dismiss, it may take judicial notice of facts outside the pleadings.  *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1281 (9th Cir. 1986).[2]  A court may look beyond the complaint to matters of public record, and doing so does not convert a motion for summary dismissal into a motion for summary judgment.  *Id.*   Accordingly, the Court shall take judicial notice of those portions of the state court record lodged by the parties.

The current Petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which was made effective on April 24, 1996. Under AEDPA, a one-year period of limitation applies to an application for a writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  The one-year period begins to run from the date of one of four triggering events, as specified in 28 U.S.C. § 2244(d)(1)(A)-(D).  The most common triggering event is the date upon which the conviction became final, either after direct appeal or after the time for seeking an appeal has expired.

The statute provides tolling (suspending) of the one-year period for all of  "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  This is called "statutory tolling."

---

[2] This case was abrogated on other grounds by *Astoria Federal Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).

MEMORANDUM DECISION AND ORDER  6

If, after applying statutory tolling, a petitioner's petition is deemed untimely, a federal court can hear the claims only if the petitioner can establish that "equitable tolling" should be applied.  In *Pace v. DiGuglielmo*, 544 U.S. 408 (2005), the Court clarified that,"[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way."  *Id.* at 418.  In order to qualify for equitable tolling a circumstance must have *caused* the petitioner to be unable to file his federal Petition in time.  The petitioner bears the burden of bringing forward facts to establish a basis for equitable tolling.  *United States v. Marolf*, 173 F.3d 1213, 1318 n.3 (9th Cir. 1999).

### B.    Discussion: Timeliness

Respondent has carefully and accurately set forth the long procedural history of this case.  (Docket No. 156.)  The Court will repeat only those portions of the history pertinent to the statute of limitations issue.  After jury trial and sentencing, Petitioner filed an appeal which was heard by the Idaho Court of Appeals.  That court affirmed the conviction and sentence.  *See State v. Priest*, 909 P.2d 624 (Idaho Ct. App. 1995).  Petitioner then filed a petition for review with the Idaho Supreme Court, which was denied.  The remittitur was issued on January 31, 1996, prior to the enactment of AEDPA on April 24, 1996, (State's Lodgings C-6 through C-9), but "finality" did not occur until 90 days later, when the time period for filing a writ of certiorari with the United States Supreme Court expired on April 30, 1996.

MEMORANDUM DECISION AND ORDER  7

Because finality occurred after AEDPA's effective date, the federal habeas corpus statute began running when the 90-day certiorari time expired, on April 30, 1996, and ran for one year, expiring on April 30, 1997.  Petitioner had a state post-conviction action pending between February 2, 1995 and May 30, 1995, an action which was too early to toll the federal statute of limitations.  Petitioner filed a Rule 35 motion on July 16, 1997, too late to toll the federal statute.  (State's Lodging A-4.)  Neither did any of Petitioner's actions filed after the Rule 35 motion toll, extend, or resurrect the statute, which had already expired by the time Petitioner filed his federal habeas corpus petition on April 19, 2001.  *See Ferguson v. Palmateer*, 321 F.3d 820, 822 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed").

The Court now considers any additional grounds for statutory tolling, equitable tolling, or actual innocence argued by Petitioner or apparent from the record.

### C.     Background Related to Tolling and Actual Innocence Arguments

The record reflects the following history relevant to Petitioner's tolling and actual innocence arguments.  At sentencing, Petitioner's mother testified that Petitioner was born two months premature and as a child was diagnosed as having a "brain stem malformation" as a result of having severe headaches, having his face turn gray in color, and being unresponsive for hours at a time (State's Lodging A-3, pp. 758-59; State's Lodging B-7, pp. 1307-1374.)  Petitioner's older brother hung him around the waist, causing unconsciousness on one occasion, and choked him into unconsciousness on

another occasion, both instances occurring when Petitioner was four or five.  Petitioner's

mother also reported that he was electrocuted  by coming in contact with a hot wire while

playing ball and that he was beaten repeatedly by his father.  (State's Lodging B-7, pp.

1348-53.)  Petitioner also had "a history of multiple concussions, at least as a result of

being hit on the head, perhaps falling down, falling off an airplane."  (State's Lodging B-

8, p. 1481.)

Petitioner was involved in "a lot of criminal history as an adolescent," consisting

of "non-aggressive" criminal acts, that "peaked probably around his middle to late teens."

(State's Lodging B-7, p. 1412-13.)  Petitioner was first incarcerated by the IDOC as an

adult when he was 18 years old.  During that period of incarceration, it appeared that Dr.

Burton, a neurologist, conducted an EEG test on Petitioner on or about July 30, 1984, that

Petitioner's expert at sentencing described as "a documented unusual if not outright

abnormal EEG."  (State's Lodging B-8, p. 1481; State's Lodging K-1, p. 142.)  A letter

from St. Alphonsus shows that Petitioner had a CT scan on September 6, 1984; Petitioner

alleges this shows that he had an organic brain disorder.(Docket No. 106-3, p. 3.)  While

it is clear that Petitioner's mother knew that he had an organic brain disorder from

Petitioner's early childhood, and the IDOC had this information as early as 1984, it is

unclear whether this information was shared with Petitioner.

Petitioner's organic brain disorder was not a factor used at trial by his counsel,

Robert Chastain and Jeffrey Wilson.  Petitioner states that he asked them to seek a

competency hearing, but they declined, informing him that there was no insanity defense

MEMORANDUM DECISION AND ORDER  9

in Idaho.  Chastain and Wilson described Petitioner as constantly changing his story about what happened–from "I saw the body" to "The victim is still alive."  (State's Lodging B-7, p. 1247.)  Because Petitioner had so many inconsistencies in his story, his counsel advised him not to testify, and they determined that the best defense was to challenge the circumstantial evidence presented by the State and argue that it had not met its burden of proof.  (State's Lodging B-7, pp. 1174-1260.)

At trial, Snow Collett testified that Petitioner gave her a blood-encrusted open pack of cigarettes (the brand the victim, Stan Trineer used to smoke) at a restaurant, and then Petitioner told her he had killed Stan.  (State's Lodging B-4, pp. 663-666.)  Kimble Johnson testified that Petitioner led him to the site where Stan Trineer's body was, and Petitioner said, "Stan f—ed with the wrong people: and "that's what happened to people who f— with the wrong people."  (*Id.*, pp. 719-30 & 743-750.)  Kevin Johnson testified that when he asked Petitioner how Stan was doing, Petitioner said, "Stan stepped on the wrong toes and he f—ed up and I took care of him.  No one will ever see him again." (*Id.*, p. 608.)  Matthew Joseph Taylor testified that Petitioner said he and another person had killed someone, and Petitioner then described the circumstances of the killing, and Taylor took it for granted that the victim was Stan.  (*Id.*, pp. 559-62.)  Petitioner did not testify, but his counsel called a police officer, Detective Morgan, to testify about Snow Collett's recent criminal history and the penalty she avoided by testifying against Petitioner. (State's Lodging B-6, at pp. 1011-1038.)

MEMORANDUM DECISION AND ORDER  10

After Petitioner was found guilty at trial, he filed a motion to discharge his attorneys, citing a conflict of interest.  (State's Lodging A-2, p. 398.)  Klaus Wiebe and Scott Fouser were appointed as new counsel for Petitioner prior to sentencing.  (*Id*., p. 419.)

To prepare for sentencing, Petitioner's new counsel requested Petitioner's medical records, obtaining the EEG information but not the CT scan information, and had a psychological evaluation performed. Petitioner signed a release for his trial attorneys to obtain his prison medical records on October 26, 1992.  (State's Exhibit K-1, p. 91.)  Dr. Clay Ward, a neuropsychologist hired by Petitioner's counsel, reviewed Petitioner's medical records and performed the comprehensive psychological evaluation.

In Petitioner's 1993 and 1994 sentencing hearings, Dr. Ward testified in great detail about Petitioner's organic brain condition.  (State's Lodging B-8, at pp. 1408-1443.)  Dr. Ward's neuropsychological findings indicated that "Steve Priest is functioning within the average range of intelligence."  (*Id*. at p. 1416.)  The testing showed brain impairment in the left frontal lobe "that controls things like organization, planning, ability to inhibit responses, ability to initiate," and that can "control" or "disinhibit" aggression."  (*Id*. at 1417.)  As to Petitioner's performance on the personality or psychopathy tests, Dr. Ward testified:

> He really scored within average ranges on all tests of major psychopathology.  He does not appear to have a major thought disorder in the sense of him being delusional or psychotic.  In common parlance, crazy.

MEMORANDUM DECISION AND ORDER  11

He comes out basically clean on that from a psychological standpoint.  His areas of difficulties are in the personality disorders, or personality traits that are stable even during traits that tend to cause occupational or social functioning problems.

* * *

The empirical literature has shown that all the scales that Steven Priest scored high on boil down to three critical areas, and in our jargon we call these suspiciousness, grandiosity, and hostility.  Those are the three areas.  And the cluster of traits that he scored high on really measure these tendencies.

(*Id*. at pp. 1422-23.)

When asked about whether Petitioner could form a complicated "plan to drive somebody off up into the woods and put[] a gun to their head and shoot them," Dr. Ward testified that Petitioner was intellectually fit enough to do so.  (*Id*. at p. 1438.)  When asked about whether Petitioner's personality disorders made him incapable of actually having done this murder," Dr. Ward answered, "No." (*Id*., at p. 1442.)

Dr. Ward opined that Petitioner's intellectual functioning would likely improve if he stopped using drugs and alcohol, had a healthy diet, and exercised.  He also recommended that Petitioner "be evaluated for form of seizure medication or have that followed up."  (State's Lodging B-7, pp. 1446-47.)  Dr. Ward also opined that Petitioner might be prescribed a medication such as Tegretol or Inderal to "control some of the problems with impulsivity or this problem inhibiting his responses.  They also sometimes slow the brain enough a person can organiz[e] their thoughts."  (State's Lodging B-8, p. 1483.)

MEMORANDUM DECISION AND ORDER  12

### D.    Discussion of Mental Illness as a Basis for Equitable Tolling

In his Response, Petitioner argues that there were "factors outside [his] control that support [application of] an exception to the exhaustion process and negate procedural default."  (Docket No. 159, p. 6.)  The Court liberally construes this argument to also apply to the statute of limitations defense asserted by Respondent.

Here, the precise issue is whether Petitioner had a mental health condition during the period of time when his federal statute of limitations was running (April 30, 1996, through April 30, 1997), such that it prevented him from filing his federal petition on time.

In particular, Petitioner alleges that the IDOC or State did not disclose the 1984 CT scan, which showed that he had an organic brain disorder, but that Petitioner discovered its existence in June 6, 2006.  (Docket No. 159, pp. 2-7.)  He alleges that he and his counsel did not have access to the CT scan for pretrial, trial, sentencing, or appellate purposes.  Petitioner makes several different arguments surrounding his organic brain disorder and the undisclosed CT scan, which the Court will separately address.

Mental illness has been considered an "extraordinary circumstance beyond the prisoner's control" which may toll the statute of limitations.  *Calderon v. U.S. Dist. Court for Cent. Dist. of California (Kelly)*, 163 F.3d 530, 541 (9th Cir. 1998) (*en banc*).[3] Whether the limitations period should be equitably tolled depends on whether the

---

[3]  *Calderon (Kelly)* was abrogated on other grounds by *Woodford v. Garceau*, 538 U.S. 202 (2003).

MEMORANDUM DECISION AND ORDER  13

petitioner's mental illness during the time period at issue "ma[de] filing impossible." *Laws v. Lamarque*, 351 F.3d, 919, 922 (9th Cir. 2003).  Petitioner bears the burden of showing that equitable tolling should apply to his case.  *Miranda v. Castro*, 292 F.3d 1063, 1065 (9th Cir. 2002).  A petitioner wishing to assert entitlement to equitable tolling because of a mental disability must show that the "mental incompetence in fact caused him to fail to meet the AEDPA filing date." *Laws*, 351 F.3d at 923.

The Court has reviewed Petitioner's mental health history and court filings before, during, and after to the federal statute of limitations time period and finds no evidence supporting a contention that he would have been unable to file a federal habeas corpus petition.

The record reflects that Petitioner has been able to prepare and file documents in many legal actions, notwithstanding his documented organic brain disorder.   The testimony at Petitioner's sentencing hearing indicates that he had studied to become an inmate paralegal and aided other inmates in their litigation while he was a pretrial detainee, between July 12, 1991, and May 24, 1994.  The sentencing court relied on Petitioner's education and efforts in this area as a mitigating factor at sentencing.  (State's Lodging A-4, p. 1625-26.)

Petitioner's ability to file legal documents is evident from the pro se documents he filed in his state criminal case and post-conviction case in 1995, the year before the federal statute of limitations began running.  (See Docket No. 170.)   In addition, just two months after the federal statute expired, on July 16, 1997, Petitioner filed a motion for

MEMORANDUM DECISION AND ORDER  14

Rule 35 relief.  (See Idaho Supreme Court records repository register of actions at www/idcourts.us/repository.)

Reviewing actions filed in federal court, the Court finds that Petitioner filed a civil rights case against Canyon County Sheriff George Nourse on October 14, 1993. Petitioner pursued that case through January 10, 1996, when the Court granted Petitioner's oral motion to dismiss the case.  (*Priest v. Nourse*, CV93-400-S-MHW.) Therefore, the record reflects that just four months prior to the starting date of the federal statute of limitations, Petitioner was engaged in litigation, which cuts against any contention that he was unable to file his habeas corpus petition in time.

In summary, nothing in the record indicates that Petitioner was *unable* to file his habeas corpus action between April 30, 1996 and April 30, 1997.  Petitioner vaguely argues that since discovering the CT scan in 2006, he has received the proper medication for his mental condition, and that the proper medication was not provided to him until that date.  He has not provided medical records or a medical opinion showing that he was not prescribed appropriate medication between 1993 and 1996, and, even assuming that he was prescribed no medication during that time period, he was still able to pursue the numerous court actions set forth above.[4]  In addition, from its review of the entire record

_____

[4]  Petitioner had requested his medical records be produced during later state post-conviction proceedings, but the state court did not permit it. (See May 24, 2002 filing Affidavit, State's Lodging I-9; Transcript of oral argument held on January 22, 2002, State's Lodging G-2; Petitioner's Supplemental Motion via I.A.R. 32, filed June 17, 2002, State's Lodging F-22.) This Court granted Petitioner the right to review, select, and copy his relevant prison medical records.  Those records are found at State's Lodging K-1, 123-198.  The records submitted do not particularly address the time period between April 30, 1996, and April 30, 1997.  Therefore,

MEMORANDUM DECISION AND ORDER  15

in this matter, the Court sees no difference in the nature and content of his filings between 1991 and 2009 that would suggest that Petitioner received medication in 2006 that substantially increased his ability to pursue legal actions.  Rather, Petitioner demonstrated an ability to pursue his own litigation and acted as  an inmate paralegal for others in close proximity to the time period at issue.  Therefore, there is no evidence in the record that Petitioner's organic brain disorder or his lack of medication played any role in the untimeliness of his federal habeas corpus petition.

### E.    Discussion of Mental Illness as a Basis for Actual Innocence

Petitioner alleges that if he had been given access to the CT scan during trial, it would have changed the outcome of his trial; the jury would have concluded that he suffered from a brain defect that prevented him from conforming his conduct to societal norms and that his conduct was outside his own control.  Particularly, Petitioner argues that if he had notice of the CT scan during trial, the State would have been unable to prove the intent element of first degree murder beyond a reasonable doubt.

"To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  A claim of actual innocence requires a colorable showing of factual innocence.  *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

the Court looks to the remainder of the record to determine whether any indication exists that Petitioner was unable to file his habeas corpus petition between April 30, 1996, and April 30, 1997.

MEMORANDUM DECISION AND ORDER  16

For example, types of evidence "which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. at 331, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996).

If a petitioner brings forward new evidence not presented at trial which tends to show his innocence, the Court must then determine whether, "in light of the new evidence, no juror, acting reasonably, would have voted to find [the defendant] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329.

Here, Petitioner's "actual innocence" claim must be viewed in light of Idaho law governing mental illness in the criminal setting.  In Idaho, a "[m]ental condition [is] not a defense to any charge of criminal conduct."  Idaho Code § 18-207 (1982).   However, a defendant may still present a defense that, because of his mental illness, he could not have formulated the requisite intent for the charged crime.  Idaho Code § 18-207(c).

Petitioner alleges that he asked his counsel to have a competency evaluation performed, but they refused, informing him that mental illness was not a defense to the crime.  Although Petitioner's psychological evaluation at sentencing was not a competency evaluation, the comprehensive findings and conclusions there strongly suggest that Petitioner would not have been found incompetent to stand trial or found unable to form the intent to commit premeditated murder.  In addition, at sentencing Petitioner presented a variety of witnesses who testified that he functioned normally in day-to-day life.  Luella Simrell, the mother of Petitioner's fiancee, Jennie Mumbower, in

MEMORANDUM DECISION AND ORDER  17

particular, testified that he was kind and helpful, and if her daughter chose to marry Petitioner even though he was in prison, she would defer to "God's will."  (State's Lodging B-8, pp. 1484-1502.)  Jennie Mumbower testified that she and Petitioner had a "very healthy relationship" and that she still planned to marry Petitioner notwithstanding his conviction.  (*Id.*, pp. 1389 & 1399.)

In short, nothing in the record suggests that Petitioner manifested the type of mental illness that would have supported a mental illness mens rea defense.  Therefore, Petitioner has not convinced the Court that his alleged mental illness would have caused any member of the jury to find that he could not have formulated the requisite intent to commit first degree murder in shooting Stan Trineer.  In fact, the evidence referred to above is to the contrary.

### F.    Discussion of Petitioner's Argument that Discovery of the CT Scan Should Be the Beginning Date for the Statute of Limitations

Petitioner also argues that his statute of limitations on the claims related to his organic brain disorder should not have begun until after he discovered the existence of the CT scan in 2006 and exhausted the claims in state court.  He relies on 28 U.S.C. § 2244(d)(1)(D), which provides that the one-year limitation period begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through due diligence."

The Court rejects this argument because, as noted above, the factual predicate of the claim has likely been known to Petitioner for most of his life, and it was clearly a

MEMORANDUM DECISION AND ORDER  18

major part of his defense at sentencing.  That an old CT scan confirming this diagnosis existed but was not made available to Petitioner earlier in his criminal case does not re-start the statute of limitations.

### G.   Discussion of Petitioner's Allegation that his State Post-Conviction Action Remains Pending

Petitioner also argues that his state post-conviction action that was dismissed in 1995 is nevertheless ongoing and continues to toll the federal statute of limitations. (Petitioner's Motion, p. 3 Docket No. 160-2.)  He asserts that his post-conviction action is still pending because the state filed a motion for summary disposition that was not ruled upon prior to Petitioner filing a motion to voluntarily dismiss the case, which the court accepted and upon which the court entered an order of dismissal.  (State's Lodgings M-2 & M-3.)  There is no basis for such an argument.  Various parties may submit motions that would effectively dispose of the case if ruled upon, but a ruling upon on only one of these dispositive motions would end the case and moot the other pending motions.

Petitioner also argues that he did not receive a copy of the order of dismissal in that case, which was dated May 30, 1995.  However, his failure to receive the order does not render the order void, as he argues.  Petitioner has not shown that he acted diligently in trying to ascertain the status of his case, for example, that he checked the status of his case in 1995 or 1996.

MEMORANDUM DECISION AND ORDER  19

**H.      Discussion of Petitioner's Argument that the State Waived its Untimeliness Defense in the State Post-Conviction Action, Thus Waiving it in This Action**

Petitioner also argues that the State waived the statute of limitations defense in this federal habeas corpus action by filing an answer in the state post-conviction matter. (Petitioner's Motion, p. 3 Docket No. 160-2.)   There is no legal authority to support such a contention.  This case is completely separate from the state court action.  In this case, the State has filed a motion to dismiss addressing the statute of limitations issue, which is properly brought by pre-answer motion.  Neither has the State waived the statute of limitations defense by not filing an answer.

**I.      Discussion of Petitioner's Assertion that the State Court Failed to Issue a Notice of Intent to Dismiss after Petitioner Sought Voluntary Dismissal**

The Court also rejects Petitioner's argument that, after he filed his motion for voluntary dismissal in the state post-conviction matter, the state district court was required to issue a notice of intent to dismiss prior to dismissing the case.  There is nothing in Idaho law suggesting that a notice of intent to dismiss must be issued after the petitioner files a motion for voluntary dismissal.  *See* Idaho Code § 19-4906(b).[5]

---

[5] I.C. § 19-4906 provides:

> When a court is satisfied, on the basis of the application, the answer or motion, and the record, that the applicant is not entitled to post-conviction relief and no purpose would be served by any further proceedings, it may indicate to the parties its intention to dismiss the application and its reasons for so doing. The applicant shall be given an opportunity to reply within 20 days to the proposed dismissal. In light of the reply, or on default thereof, the court may order the application dismissed or grant

MEMORANDUM DECISION AND ORDER  20

**J.      Conclusion**

After a thorough review of the record in this case, including the briefs of the

parties and the state court record, the Court concludes that Petitioner's federal Habeas

Corpus Petition was untimely, and that no factual circumstances exist to excuse the

untimeliness, including consideration of the principles of statutory tolling, equitable

tolling, and actual innocence.  Accordingly, Petitioner's Petition shall be dismissed with

prejudice.

**REVIEW OF THE CLAIMS AND THE COURT'S DECISION
FOR PURPOSES OF CERTIFICATE OF APPEALABILITY**

In the event Petitioner files a timely notice of appeal from the Order and Judgment

in this case, and in the interest of conserving time and resources, the Court now evaluates

the claims within the Petition for suitability for issuance of a certificate of appealability

(COA), which is required before a habeas corpus appeal can proceed.  28 U.S.C. §

2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  A COA will issue only

when a petitioner has made "a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a

petitioner must show "that reasonable jurists could debate whether (or, for that matter,

agree that) the petition should have been resolved in a different manner or that the issues

_____

> leave to file an amended application or, direct that the proceedings
> otherwise continue. Disposition on the pleadings and record is not
> proper if there exists a material issue of fact.

presented were adequate to deserve encouragement to proceed further.*"* *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed a petition or claim on procedural grounds, in addition to showing that the petition "states a valid claim of the denial of a constitutional right," as explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has denied Petitioner's claims on procedural grounds. The Court finds that additional briefing on a COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the Court's decision on the procedural issues and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action. Petitioner may file a notice of appeal within thirty (30) days after entry of this Order and request a COA from the Ninth Circuit Court of Appeals, if he desires, pursuant to Federal Rule of Appellate Procedure 22(b).

MEMORANDUM DECISION AND ORDER  22

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED:

1.      Petitioner's Motion to Proceed in Forma Pauperis (Docket No. 150) is

GRANTED;

2.      Petitioner's Motion for Reconsideration of Order of October 21, 2008

(Docket No. 148) is GRANTED to the extent that Petitioner shall be

permitted to substitute his warden as the Respondent in this case, and it is

DENIED in all other respects;

3.      Respondent's Motion for Extension of Time in which to file a dispositive

motion in this case (Docket No. 154) is GRANTED;

4.      Petitioner's Motion to Extend Time to File a Statement of Factual Issues

(Docket No. 161) is GRANTED;

5.      Petitioner's "Motion for Permission to File with the Court Based on Extra-

Ordinary Circumstances" (Docket No. 160) is GRANTED;

6.      Petitioner's Motion to Augment the Record (Docket No. 164) is

GRANTED;

7.       Respondent's Motion to Dismiss (Docket No. 156) is GRANTED; and

8.      Petitioner's Petition is DISMISSED with prejudice.

IT IS FURTHER HEREBY ORDERED that the Court will not grant a Certificate

of Appealability in this case.  If Petitioner chooses to file a timely notice of appeal, the

Clerk of Court is ordered to forward a copy of this Order, the record in this case, and

Petitioner's notice of appeal, to the United States Court of Appeals for the Ninth Circuit.



DATED: September 23, 2009

_____
Honorable Mikel H. Williams
Chief United States Magistrate Judge

MEMORANDUM DECISION AND ORDER  24